NO. 24-10289-HH

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

v.

RODNEY LEROY BROWN,

*Defendant/Appellant.*

————————

On Appeal from the United States District Court
for the Southern District of Florida

————————

BRIEF OF THE APPELLANT
RODNEY LEROY BROWN

————————

HECTOR A. DOPICO
  Interim Federal Public Defender
SARA W. KANE
  Assistant Federal Public Defender
  Attorney for Appellant
  One E. Broward Blvd., Suite 1100
  Fort Lauderdale, Florida 33301
  Telephone No. (954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Rodney Leroy Brown
### Case No. 24-10289-HH

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Alexander, Ajay, Assistant United States Attorney

Brown, Rodney Leroy, Defendant/Appellant

Caruso, Michael, Former Federal Public Defender

Delgado, Jorge R., Assistant United States Attorney

Dopico, Hector A., Interim Federal Public Defender

Gilbert, Jean-Pierre, Assistant Federal Public Defender

Hunt, Honorable Patrick M., United States Magistrate Judge

Kane, Sara W., Assistant Federal Public Defender

Koontz, M. Catherine, Assistant United States Attorney

Lapointe, Markenzy, United States Attorney

Latta, Brooke, Assistant United States Attorney

Louis, Honorable Lauren Fleischer, United States Magistrate

> Judge

Matzkin, Daniel, Chief, Appellate Division, United States

> Attorney's Office

McDonald, Ian, Assistant Federal Public Defender

Mollison, Kathleen E., Assistant Federal Public Defender

Moore, Honorable K. Michael, United States District Judge

Stone, Emily R., Assistant United States Attorney

United States of America, Plaintiff/Appellee

<u>s/Sara W. Kane</u>

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents an early opportunity to apply *Smith v. Arizona*, which recently clarified the application of the Confrontation Clause to "surrogate" expert testimony and, in so doing, abrogated several contrary lower court opinions. 144 S. Ct. 1785, 1801-02 (2024); *id.* at 1794 n. 2 (explicating abrogating *United States v. Murray*, 540 F. App'x 918 (11th Cir. 2013)). The district court below did not have the benefit of *Smith* when it allowed the government's DNA expert to testify about DNA results and analysis conducted by individuals who did not testify. The DNA testimony provided the strongest connection between Mr. Brown and the armed robbery for which he is now serving 324 months in prison. With the benefit of *Smith* on appeal, it is now clear that the government's surrogate DNA expert testimony violated the Confrontation Clause. Because this plain-error appeal involves a determinative change in the law, as well as a lengthy—and unconstitutional—sentence, the defendant respectfully submits that oral argument is necessary to the just resolution of his appeal.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CITATIONS ................................................................. iv

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES .......................................................... 2

STATEMENT OF THE CASE ............................................................. 3

    Course of Proceedings and Disposition

       in the District Court .......................................................... 3

      Statement of Facts ........................................................... 5

      Standards of Review ........................................................ 13

SUMMARY OF THE ARGUMENT ..................................................... 14

ARGUMENT AND CITATIONS OF AUTHORITY .............................. 16

I.   The district court plainly erred by allowing the government's
    DNA expert to testify about DNA results, analysis, and a
    report that non-testifying individuals obtained, conducted,
    and wrote, in violation of the Confrontation Clause ...................... 16

      a.   The DNA expert testimony plainly violated the
         Confrontation Clause ............................................... 17

b.    Mr. Brown was substantially prejudiced by Mr. Aguilar's unconstitutional testimony, and the Court should exercise its discretion to correct this significant error ...........................25

II.   The district court plainly erred by applying a career offender enhancement to Mr. Brown's pre-November 1, 2023 Hobbs Act robbery and firearm offenses, in violation of the *Ex Post Facto* Clause, and U.S.S.G. § 1B1.11(b)(1) ...............................................29

CONCLUSION ...........................................................................34

CERTIFICATE OF COMPLIANCE.........................................................35

CERTIFICATE OF SERVICE................................................................36

iii

# TABLE OF CITATIONS

## CASES:

*Bullcoming v. New Mexico*,

564 U.S. 647 (2011) ................................................................ 16, 20, 25

*Crawford v. Washington*,

541 U.S. 36 (2004) ........................................................................ 16, 20

*Delaware v. Fensterer*,

474 U.S. 15 (1985) ................................................................................ 21

*Henderson v. United States*,

133 S. Ct. 1121 (2013) ......................................................................... 18

*Melendez-Diaz v. Massachusetts*,

557 U.S. 305 (2009) ........................................................... 16, 20, 24-25

*Molina-Martinez v. United States*,

578 U.S. 189 (2016) ............................................................................. 32

*Rodriguez v. Inch*,

No. 2:19-CV-14250-KMM, 2022 WL 2528410

(S.D. Fla. July 7, 2022).......................................................................... 19

*Rosales-Mireles v. United States,*

    585 U.S. 129 (2018) ............................................................................ 32

*Smith v. Arizona,*

    144 S. Ct. 1785 (2024) ......................................... i, 2, 15, 18-22, 25, 28

*Stuart v. Alabama,*

    139 S. Ct. 36 (2018) ........................................................................... 24

*United States v. Butler,*

    737 F. App'x 518 (11th Cir. 2018) ................................................... 27

*United States v. Eason,*

    953 F.3d 1184 (11th Cir. 2020) ........................................................ 30

*United States v. Hesser,*

    800 F.3d 1310 (11th Cir. 2015) ........................................................ 28

*United States v. Ignasiak,*

    667 F.3d 1217 (11th Cir. 2012) ........................................................ 22

*United States v. Jiminez,*

    564 F.3d 1280 (11th Cir. 2009) ........................................................ 19

*United States v. Maurya,*

    25 F.4th 829 (11th Cir. 2022) ....................................................... 13, 31

*United States v. Murray,*

    540 F. App'x 918 (11th Cir. 2013) ...................................................... i, 18

*United States v. Ross,*

    33 F.3d 1507 (11th Cir. 1994) ............................................................ 29

*Williams v. Illinois,*

    132 S. Ct. 2221 (2012) ........................................................... 19-20, 24

## STATUTORY AND OTHER AUTHORITY:

U.S. Const. amend. VI ................................................................. 16

18 U.S.C. § 924 ....................................................................... 31

18 U.S.C. § 924(c) .................................................................... 30

18 U.S.C. § 924(c)(1)(A)(ii) .......................................................... 3

18 U.S.C. § 1951(a) .................................................................... 3

18 U.S.C. § 1951(b)(1) ................................................................. 3

18 U.S.C. § 1951(b)(3) ................................................................. 3

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3742 .................................................................. 1

28 U.S.C. § 1291 .................................................................. 1

U.S.S.G. § 1B1.10 ................................................................ 2

U.S.S.G. § 1B1.11 ............................................................... 15

U.S.S.G. § 1B1.11(b)(1)..................................................... 29, 31

U.S.S.G. § 4B1.1(a)(2)........................................................... 30

U.S.S.G. § 4B1.1(c)............................................................... 30

U.S.S.G. Amendment 822 ....................................................... 31

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was filed on January 24, 2024, from the final judgment and commitment order entered on January 12, 2024, which disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

**I.**     Whether, pursuant to *Smith v. Arizona*, 144 S. Ct. 1785 (2024), the district court plainly violated Mr. Brown's Confrontation Clause rights by allowing the government's DNA expert to testify about DNA testing, results, and analysis performed by individuals who did not testify, while relying on an out-of-court analyst's report.

**II.**    Whether the district court plainly erred by applying a career offender enhancement to Mr. Brown's pre-November 1, 2023 Hobbs Act robbery offense, in violation of the *Ex Post Facto* Clause, and U.S.S.G. § 1B1.10.

## STATEMENT OF THE CASE

The appellant, Rodney Brown, was the defendant in the district court and will be referred to by name or as the defendant. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document number and page number listed on the header generated by the district court's electronic filing system as prescribed by the Rules of this Court. *See* 11th Cir. R. 28-5.

The defendant is incarcerated.

### Course of Proceedings and Disposition
### in the District Court

Mr. Brown was charged by indictment with a March 18, 2023 Hobbs Act robbery, in violation of 18 U.S.C §§ 1951(a), (b)(1) & (b)(3), and with brandishing a firearm, during and in relation to, or in furtherance of, that Hobbs Act robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). (DE7).

Upon learning that Mr. Brown intended to proceed to trial, the government obtained his DNA through a search warrant. (DE23:2). Prior to trial, the government told the District Court that it expected

3

the DNA analysis and report to be "instrumental to the United States case in chief," and "highly probative in this matter." (DE23:2-3). Mr. Brown proceeded to a jury trial, the government entered its DNA evidence through an expert, and Mr. Brown was found guilty as to both counts. (DE47; DE84:75-99).

Unites States Probation first prepared a draft Pre-Sentencing Report, in which it calculated Mr. Brown's advisory guideline range as to count 1 to be 70 to 87 months imprisonment. (Draft PSR ¶ 91). Probation then prepared a final Pre-Sentencing Report, in which it determined that Mr. Brown qualified as a career offender. (Final PSR ¶ 30; DE53-1). Mr. Brown's career offender guideline range was 294 to 348 months imprisonment. (Final PSR ¶ 92).

At sentencing, the district court adopted the Final PSR in its entirety, including the career offender guideline range. (Statement of Reasons; DE74:3). The district court imposed 240 months imprisonment—the statutory maximum sentence—as to count 1, to be followed by the minimum mandatory sentence of 84 months imprisonment, as to count 2, for a total sentence of 324 months

imprisonment, to be followed by 3 years of supervised release, and $ 2700 in restitution. (DE60).

This appeal followed.

## Statement of Facts

The following evidence and argument was presented at Mr. Brown's trial.

The government and defense agreed that a robbery occurred; they disagreed only as to the identity of the robber. (DE86:12-14).

1. Witness Testimony

The first witness was the robbery victim, who explained that she was working at her husband's convenience store, and their five year-old son was with her, when a masked man, pointing what she believed to be a firearm in his hand—with another at his waist—told her to give him all of the money, or he would shoot her and her son. (DE84:7-23). The victim complied, and the robber fled. *Id*.

When later shown a photographic array that included Mr. Brown, the victim did not identify the robber. (DE84:23-24, 59-60).

Law enforcement witnesses obtained various items that they believed to be connected to the robbery, including: an orange soda bottle, found among other discarded bottles near the store's dumpster; a black mask, found on the ground, near a roll of pennies, across a field from the store; and a mountain dew bottle, left by the robber inside of the store. (DE84:36-43).

Swabs from these items were submitted to the Broward Sheriff's Office crime lab. (DE84:52-54). The Broward lab reported that there were two contributors to the DNA on the orange soda bottle and the black mask. (DE84:57).

Pursuant to a federal search warrant, an ATF agent obtained DNA swabs from Mr. Brown while he was detained pretrial. (DE84:64-68). ATF submitted Mr. Brown's swabs to DNA Labs International (DLI), along with the earlier-tested swabs from the orange soda bottle, and the black mask. (DE84:64-68, 73-74, 81-82).

No weapon was recovered. (DE84:75).

The government's last witness was a DNA expert named Daniel Aguilar. (DE84:75-99). Mr. Aguilar is a senior DNA analyst for DLI. *Id.* at 76. As to his current role at DLI, Mr. Aguilar explained that:

> So originally I was trained to do all steps of the DNA forensic [] process all the way through the laboratory up through analysis and reporting.
>
> Currently my position at DLI . . . entails actually only doing the analysis portion, so the laboratory generates the – we generate the profiles in the laboratory and then I get the data and I look at those profiles and I make my determinations of those profiles.
>
> So I interpret them. I do comparisons if I have a standard or a person to compare to. And I report those findings and I testify to them.

*Id.* at 77-78.

As to his role in Mr. Brown's case, Mr. Aguilar clarified that he was "the technical reviewer rather than the author of the report." *Id.* at 78. He further elaborated that:

> So, as I mentioned, normally what happens is that for the . . . the writer of the case, is that writer will get that data that has been generated in the laboratory and they will make their determination and comparisons and they will author the report. And in so doing, they actually go through all the steps that everybody before them already did in the laboratory. Since they're not doing the hands-on laboratory work themselves, we're all working from the same set of – the same cookbook, basically, the standard operating procedures. So we're all working the exact same way so that

7

we all know what we're doing. And that individual who is writing the report will take ownership through all those documents of everything that everybody in the laboratory did before them so that when they sign that report, they own everything that happened.

A second person, a second qualified analysis, will then repeat the same process and make sure that they agree with all of the conclusions that the first analyst came to. So, in this case, Ms. Lisbeth Colon actually went through the entire process of writing the case and I came behind her and repeated the same process and I agree with all of those findings.

And that is my role as a technical reviewer.

*Id.* at 79-80.[1]

When asked to discuss "what the laboratory analysis entailed" in this case, Mr. Aguilar explained that:

So what generally happens is that the evidence will get checked into a locker, a secure vault actually, when we received it, and then the serologist or screener will remove that when the time comes, and they will go ahead and cut, in this case, swabs that were received. They will cut portions of those swabs into small tubes that are maybe like an inch or two long. And the new take it to the four main laboratory processes.

So those four steps are extraction, which is when we expose those swabs or the sample to solutions that break open the cells and release the DNA and purify that DNA.

---

[1] Mr. Brown is filing, along with this brief, a motion to supplement the record on appeal with the "report"—entitled a "Certificate of Analysis"—of DNA analyst Lisbeth Colon, to which Mr. Aguilar referred during his testimony.

The next step is quantitation, which is where we, as the name implies, we find out exactly how much DNA is in that extract that we've created.

The third step is amplification. Amplification involves – it's sort of like a biological Xerox copier where we start with, say, two copies of DNA. And then after one cycle, we have 4 copies of DNA and then we have 8 copies and 16 copies and 32 copies. With every round it doubles. So after a few rounds, we actually end up with millions and millions of copies when we only started with a few to begin with. And when we do that, we tag specific areas of it with colored dye so that we can see them later.

The fourth step that we then take it through is we take that amplified DNA and we put it through an instrument that allows us to see the DNA profile as a series of peaks. So if you imagine sort of like a heart monitor where there's a baseline, and then when your heart beats, there's a peak. So several of those peeks will appear wherever DNA is present, and those peaks are assigned numbers and those numbers become the DNA profile.

*Id*. at 81-83.

The government further asked Mr. Aguilar:

[I]n this specific case, based on the examination that was done by DNA Laboratories and your review of that data, what were you able to – what conclusions were you able to derive? And let's first start with the swabs of the mouthpiece of the orange soda bottle.

*Id*. at 87 Mr. Aguilar responded that:

So in this particular instance, what we were able to get was a DNA profile from a single male individual. And that is important because most of the DNA profiles that we get

these days tend to be mixtures of several individuals. But this was a single male profile that I was then able to compare to the profile of Mr. Brown.

The government next asked, "[W]hat determination did you make when that profile was compared from the -- the male contributor profile compared from the orange soda bottle to Mr. Brown?" *Id.* at 88. And Mr. Aguilar answered:

> So the statistic that we report is called the random match probability. And what that describes is if you, sort of, picture like a giant punch bowl that you're using like for a drawing or a lottery and you have --Mr. Brown is outside of the bowl. And then the bowl is full of other people who are not Mr. Brown, how big and how many people have to be in that bowl where only one of those people has the exact same profile as Mr. Brown. So how many people would you have to kind of go through or how many people have to be in that bowl. In this case, that number is 1 in 36 nonillion people. And that is a 36 with 30 zeros behind it.

*Id.*

The government also asked Mr. Aguilar about "the swabs from the inside of the mask to the swabs from the defendant Rodney Leroy Brown, what was the analysis in that one?" *Id.* at 90. Mr. Aguilar responded:

> We actually got the same DNA profile from the same or what I assume is the same male contributor from the inside of the

10

mask or the swabs from the inside of the mask as well. And, again, the comparison gave us the same statistic, 36 nonillion.

*Id.*

During cross examination, Mr. Aguilar confirmed that he was not the analyst, but rather the technical reviewer, in this case. *Id.* at 93. During redirect, Mr. Aguilar agreed that, pursuant to the DNA analysis, "the likelihood that [the DNA in this case] would be someone unrelated to [the defendant] is 1 in 36 nonillion." *Id.* at 98.

2. Exhibits

Several exhibits were admitted. *See* DE49.

The government submitted video surveillance from the store during the robbery (Gov't Ex. 3B), and video surveillance from a nearby gas station, just before the robbery (Gov't Ex. 4B). Both videos depict the robbery suspect, who appears to be wearing all black. *See id.*

 The government submitted the orange soda bottle and the black mask, as well as the swabs taken from these items, and the swab from Mr. Brown. (DE49 (listing Gov't Ex. 7, 8, 9A, 9B, 10)).

The government also submitted a still-image of the suspect's face from the gas station surveillance video (DE49-1:16 (Gov't Ex. 11)), a photograph of Mr. Brown (DE49-1:14 (Gov't Ex 5)), and photographs of the robbery scene—and vicinity—after the robbery (DE49-1:2-11 (Gov't Ex. 2A-2J)).

3. Closing Arguments

In its first closing argument, the government relied on Mr. Aguilar's testimony, including as follows:

> You heard the DNA examination done by Mr. Aguilar, ladies and gentlemen. One in 36 nonillion, probably a number that many individuals haven't even heard of. But it's the number 36 with 30 zeros. That's the likelihood it's anybody else.

*Id.* at 107. The government further argued that "the mask has his DNA," "Mr. Aguilar said there's one male contributor, and it's him." *Id.* at 108, 109. In its second closing argument, the government argued that:

> [Mr. Aguilar's] job is to analyze and to testify to that fact . . . He testified that these are the results. It's this defendant . . . He testified the analysis that was done [at DLI . . .] based on his ten years of experience . . . these are the results that he stands by, and it's this defendant.

12

*Id.* at 117. "Mr. Aguilar said, no, there was one male contributor, and that's Rodney Leroy Brown." *Id.* at 118.

4. Deliberations & Verdict

They jury submitted a number of questions and requests during the first day of deliberations, focused primarily on the video surveillance footage that they had been shown during the trial. (DE46).

On the second day of deliberations, the jury ultimately entered a guilty verdict on both counts. (DE47; DE85:2-3). As to count 2, the jury specifically found that the defendant possessed, carried, and brandished a firearm in furtherance of, and in relation to, the Hobbs Act robbery in count 2. *Id.*

## Standard of Review

Constitutional errors not raised below are reviewed for plain error, which requires that the defendant-appellant establish: (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that, "if left uncorrected, would seriously affect the fairness, integrity, or public reputation of a judicial proceeding." *United States v. Maurya*, 25 F.4th 829, 836 (11th Cir. 2022) (internal citation omitted).

## SUMMARY OF THE ARGUMENT

I.    The question at trial was not whether a robbery occurred, but, rather, who did it. The victim and sole eyewitness could not identify the robber. The surveillance videos collected from the relevant scenes were not clear enough to establish the robber's identity. No evidence collected from the robbery itself was forensically connected to Mr. Brown. Yet the government's DNA expert, Daniel Aguilar, testified that the odds that the DNA found on the black mask and orange soda bottle—purportedly discarded by the robber, nearby—was from someone *unrelated* to Mr. Brown, were "1 in 36 nonillion people. And that is a 36 with 30 zeros behind it." So, Mr. Brown was convicted.

However, Mr. Aguilar did not conduct or observe the laboratory testing of the DNA in this case. Mr. Aguilar also did not conduct or observe the original analysis of the laboratory testing of the DNA in this case. And Mr. Aguilar did not write the sole report of the DNA analysis conducted in this case. Despite this glaring lack of personal knowledge, Mr. Aguilar testified as to the laboratory results, as to the analysis of those results, *and* Mr. Aguilar testified that he agreed with

those results and analysis—all while relying on the testimonial report of an analyst that never testified.

Pursuant to *Smith v. Arizona*—published after Mr. Brown's trial—Mr. Aguilar's "surrogate" expert testimony plainly violates the Confrontation Clause of the Sixth Amendment. *See* 144 S.Ct. 1785 (2024). Given the importance of Mr. Aguilar's unconstitutional testimony to the government's case, Mr. Brown's convictions must be vacated.

II. At the time of the March 18, 2023 offense conduct, Hobbs Act robbery was not a "crime of violence," under the then-applicable guidelines. Thus, application of the career offender enhancement to Mr. Brown's offense conduct constitutes an *ex post facto* violation, and a violation of U.S.S.G. § 1B1.11. Given the fifteen-year discrepancy between the career offender and the non-career offender sentencing guideline range, Mr. Brown was substantially prejudiced by this error. His 324-month sentence of imprisonment must therefore be vacated, and his case remanded for a resentencing hearing without application of the career offender enhancement.

15

## ARGUMENT AND CITATIONS OF AUTHORITY

As explained in detail below, Mr. Brown's Hobbs Act robbery and firearm convictions were obtained through expert testimony that violates the Confrontation Clause, and the sentencing guideline calculation underlying his 324-month sentence of imprisonment violates the *Ex Post Facto* Clause. Although these constitutional errors were not raised below, they nonetheless satisfy plain error, and the Court should accordingly vacate Mr. Brown's convictions and sentence.

**I.    The district court plainly erred by allowing the government's DNA expert to testify about DNA results, analysis, and a report that non-testifying individuals obtained, conducted, and wrote, in violation of the Confrontation Clause.**

The Confrontation Clause protects a defendant's right to confront those individuals who make "testimonial" statements against him. *See* U.S. CONST. AMEND. VI; *Crawford v. Washington,* 541 U.S. 36, 50-51 (2004). This protection applies equally to forensic evidence. *Melendez– Diaz v. Massachusetts,* 557 U.S. 305, 310-311 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 662-664 (2011). As argued below, the DNA evidence in this case was admitted in violation of the Confrontation

Clause. Because that wrongly-admitted evidence provided the most compelling link—by far—between Mr. Brown and the armed robbery, his convictions must be vacated.

a. The DNA expert testimony plainly violated the Confrontation Clause.

Mr. Aguilar, a senior analyst at DNA Labs International (DLI), testified that the laboratory at DLI received three swabs: one from Mr. Brown, one from an orange soda bottle, and one from a black mask; that the laboratory ran various forensic tests on those swabs; and, from those tests, the laboratory produced three DNA profiles. (DE84:77-84, 87-90). Yet Mr. Aguilar did not personally receive or observe the receipt of those swabs; he did not personally run or observe the testing conducted on those three swabs; and he did not personally obtain the DNA profiles that resulted from that testing. *See id*. at 77-90.

Mr. Aguilar also testified about conclusions which presumed the validity and accuracy of those DNA profiles, including that: the profiles were from only one male contributor; Mr. Brown could not be excluded as that contributor; and there was virtually zero likelihood that the contributor was unrelated to Mr. Brown. *See id*. at 77-91.

17

Mr. Aguilar further testified that he had reviewed, and agreed with, the analysis of the laboratory results, which was conducted by another non-testifying DNA analyst. *Id.* at 79-80. Mr. Aguilar did not write the sole report outlining the results of the DNA analysis conducted in this case, and upon which his testimony was based. *See id.*

Mr. Aguilar's testimony about laboratory testing, results, and analysis that he neither performed nor observed plainly violates *Smith v Arizona*, 144 S. Ct. 1785 (2024), an opinion published several months after Mr. Brown's trial. *See also Henderson v. United States*, 133 S.Ct. 1121, 1127 (2013) (holding that an error made plain by the time of appellate review satisfies the "plain error" standard).

Prior to *Smith*, several courts—including in this circuit—had relied on a fractured Supreme Court opinion to conclude that experts could testify about non-testifying expert's analysis and results, based on the reasoning that the non-testifying expert's assertions were not offered "to prove the truth of the matter asserted," but, rather, "for the purpose of explaining the assumptions on which [the testifying expert's] opinion rest[ed.]" *See, e.g., United States v. Murray*, 540 F. App'x 918,

921 (11th Cir. 2013) (quoting *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012)); *Rodriguez v. Inch*, No. 2:19-CV-14250-KMM, 2022 WL 2528410, at *4 (S.D. Fla. July 7, 2022) (relying on *Murray* and a plurality in *Williams* to reject the petitioner's Sixth Amendment challenge to admission of a toxicology report through an expert who did not prepare the report). Because these courts had concluded that non-testifying experts' assertions were not "hearsay," it did not matter whether their non-hearsay assertions were testimonial. *See id. See also United States v. Jiminez*, 564 F.3d 1280, 1286–87 (11th Cir. 2009) ("There can be no doubt that the Confrontation Clause prohibits *only* statements that constitute impermissible hearsay . . . '[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'") (internal citation omitted).

The Supreme Court in *Smith* directly addressed whether an expert could offer an "independent opinion" that was based on the laboratory work of a non-testifying expert, without violating the rule against hearsay, and thereby implicating the Confrontation Clause. 144 S. Ct. 1785, 1801-02.

19

The Court firmly rejected the reasoning, and result, of the plurality in *Williams*, this Court in *Murray*, and of the Arizona Supreme Court, below. *Id*. Instead, the Supreme Court in *Smith* reiterated that the government may not introduce the testimonial out-of-court statements of a forensic analyst at trial, including "through a surrogate analyst who did not participate in their creation." *Id*. at 1802 (citing *Crawford*, 541 U.S., at 68; *Melendez-Diaz*, 557 U.S., at 311; *Bullcoming*, 564 U.S., at 663).

Applying these rules to the scenario at issue, the Court held that:

> [N]othing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them.

*Id*.

*Smith* applies, on all fours, to bar Mr. Aguilar's testimony. Mr. Aguilar acted as a "surrogate" witness for multiple other individuals at DLI who did not testify. The government framed its questions to Mr. Aguilar accordingly, such as asking him for conclusions "based on the

20

examination that was done by DNA Laboratories and your review of that data." (DE84:87). Mr. Aguilar often responded with the first-person plural because he was referring to actions taken and results that were initially obtained by *other people* working at DLI. *See id.* ("[W]e were able to get [] a DNA profile from a single male individual[.]"); *id.* at 88 ("the statistic that <u>we</u> report is called the random match probability"); *id.* at 90 ("<u>We</u> actually got the same DNA profile from the same or what I assume is the same male contributor from the inside of the mask . . . the comparison gave <u>us</u> the same statistic, 36 nonillion."); *id.* at 95 ("I'm confident that <u>we</u> got the results that <u>we</u> got based on <u>our</u> own protocols[.]") (emphases added).

The Confrontation Clause safeguards a defendant's "opportunity for effective cross-examination." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (per curiam). Yet, because so much of Mr. Aguilar's testimony was based on the work of individuals who were never subject to cross-examination, Mr. Brown "ha[d] no opportunity to challenge the veracity of the out-of-court assertions that [we]re doing much of the work," regarding the DNA evidence against him. *See Smith*, 144 S. Ct. at 1799.

Mr. Aguilar's testimony that he reviewed, and agreed with, another DNA analyst's work (DE84:80), further "compounded the Confrontation Clause error." *See United States v. Ignasiak*, 667 F.3d 1217, 1234 (11th Cir. 2012) (observing that a testifying expert's "agreement with the non-testifying [expert]'s conclusions . . . only compounded the Confrontation Clause error that occurred").

Moreover, the out-of-court assertions upon which Mr. Aguilar's testimony was based were created for the *sole* purpose of Mr. Brown's prosecution. *See Smith*, 144 S. Ct. at 1792-1801 (explaining that evidence is testimonial if its "primary purpose" is for use in a criminal trial). Upon learning that Mr. Brown intended to proceed to trial, the government sought and obtained a federal search warrant for his DNA. (DE23:2). Pursuant to that warrant, an ATF agent obtained Mr. Brown's DNA at the Federal Detention Center. (DE84:65). The government then sought a continuance of the trial on the basis that the DNA analysis and report that it expected DLI to provide would be "instrumental to the United States case in chief," and "highly probative in this matter." (DE23:2-3).

DLI's testing and analysis occurred *after* the swabs from the orange soda bottle and the black mask had already been tested by the Broward County crime lab. (DE84: 52-53, 56-57, 65-67, 73-74, 95). But, because the Broward County crime lab testing occurred before Mr. Brown was a suspect, DLI was the "only lab that had access and tested Mr. Brown's DNA." (DE23; DE84:74).

According to Mr. Aguilar, DLI normally receives a summary of the case, prior to performing the testing and analysis of those swabs; the DLI employees who tested and analyzed Mr. Brown's DNA were thus presumably aware that Mr. Brown was the sole robbery suspect. *See* DE84:91.[2] Mr. Aguilar further described his role at DLA as necessarily involving testifying as to the results of the DNA analyses he performed there—as well as, apparently, the results of the DNA analyses performed by others. *See* DE84:78-80.

Because DLI's DNA testing was conducted solely for the government's prosecution of Mr. Brown, the DNA profiles extracted

[2] That DLI was informed that Mr. Brown was the sole suspect is clear from the "report" to which Mr. Aguilar referred during his testimony. That "report" is actually a "certificate of analysis," which was submitted as an exhibit to Mr. Brown's pending motion for leave to supplement the record.

from the swabs submitted by ATF to DLI, the conclusion that those profiles belonged to Mr. Brown or a sole male contributor, and DLI analyst Lisbeth Colon's entire report—including her conclusion that Mr. Brown, or his relative, was virtually certain to be that sole male contributor—all constitute testimonial hearsay. *See Williams*, 567 U.S., at 84 (plurality op.) (determining that forensic results are testimonial when they are "prepared for the primary purpose of accusing a targeted individual" who is "in custody [or] under suspicion"); *id.* at 121 (Kagan, J., dissenting) (contending that a forensic report qualifies as testimonial when it is "made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial"); *Melendez-Diaz*, 557 U.S., at 311 (finding that forensic analysis results were created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial"). *See also Stuart v. Alabama*, 139 S. Ct. 36, 37 (2018) (Gorsuch, J., dissenting from denial of certiorari) (explaining that eight justices in *Williams* agreed that a forensic report

24

prepared for the primary purpose of accusing an in-custody individual would qualify as testimonial).

Mr. Brown had the constitutional right to confront the individuals who tested and analyzed the DNA evidence that was offered to the jury, by the government, to convict him. That right was repeatedly violated by Mr. Aguilar's testimony, in clear violation of the Confrontation Clause, as articulated in *Smith, Melendez-Diaz*, and *Bullcoming*.

b. <u>Mr. Brown was substantially prejudiced by Mr. Aguilar's unconstitutional testimony, and the Court should exercise its discretion to correct this significant error.</u>

Mr. Aguilar testified that the odds that the DNA on the orange soda bottle, or the mask, belonged to someone unrelated to Mr. Brown, was one in 36 nonillion people – a number that is "billions and billions of times" larger than the Earth's population. (DE84:88-90). This striking DNA evidence—and Mr. Aguilar's testimony in general—was heavily emphasized by the government at opening, and closing, arguments. (DE84:13, 107, 108, 109,117, 118, 119, 120).

The government's emphasis on Mr. Aguilar's testimony makes sense, considering that—even according to the government—the next-

best evidence connecting Mr. Brown to the robbery consisted of a still surveillance image depicting a Black man at a nearby gas station before the robbery. (DE49-1:15 (Gov't Ex. 11); DE84:115-116). That photograph *might* depict Mr. Brown. *Compare id.*, *with* DE49-1:14 (Gov't Ex. 5). Or, it might depict any one of several thousand—or million—other Black men.

No other video surveillance provided the jury with a clear image of the robber's face or other identifying characteristics. *See* Gov't Ex. 3B; Gov't Ex. 4B. In fact, *after* the jury re-watched the gas station surveillance video—depicting the clearest available image of the robber's face—the jury still asked whether it was "undisputed that the defendant" was at the gas station. (DE46; DE84:153-156). In other words, the jury was not convinced by the clearest photograph or video in evidence that the person depicted was the defendant Mr. Brown. *See id*.

The victim and sole eyewitness did not identify Mr. Brown as the robber, despite Mr. Brown's inclusion in the photographic array that she was provided with—*and* the victim's belief that she could identify the robber, if she saw him again. (DE84:59-60).

Other DNA testing concluded that there were two contributors to the orange soda bottle, and the black mask—neither of which, it bears repeating, were found at the robbery scene itself. (DE84:52, 57).

The weapon was also never recovered. (DE84:60, 75). Nor was Mr. Brown otherwise connected to a weapon, through social media, for example. *Cf. United States v. Butler*, 737 F. App'x 518-519 (11th Cir. 2018) (affirming district court's admission of a Facebook photograph of the defendant holding a firearm three days after firearm offense). There was also no evidence connecting Mr. Brown to the robbery location, or to any of the locations nearby—including the apartments where the mask was found. There was also no evidence connecting Mr. Brown to the cash (or purse) seized by the robber, and there was no evidence connecting Mr. Brown to any of the clothing worn by the robber.

Again, the identity of the robber was the *only* issue at trial. Even *with* the DNA evidence, the jury issued several notes, and deliberated for ten hours—after hearing less than three hours of testimony. *See generally* DE84; DE85; DE46. Without Mr. Aguilar's plainly

27

unconstitutional DNA testimony, the government could never have established Mr. Brown's guilt beyond a reasonable doubt.

Because there is—at a minimum—a reasonable probability that, absent Mr. Aguilar's unconstitutional testimony, Mr. Brown would have been acquitted, this error satisfies the third prong of plain error. *See United States v. Hesser*, 800 F.3d 1310, 1325 (11th Cir. 2015) (an error affects a defendant's substantial rights "if there is a reasonable probability of a different result absent the error").

This error also satisfies the fourth prong of plain error. Allowing this error to go uncorrected would permit the very same "end-run" around the Confrontation Clause that the Supreme Court rejected in *Smith*:

> On [Arizona's] view, a surrogate analyst can testify to all the same substance—that is, someone else's substance—as long as he bases an "independent opinion" on that material. And that is true even if, as here, the proffered opinion merely replicates, rather than somehow builds on, the testing analyst's conclusions. So every testimonial lab report could come into evidence through any trained surrogate, however remote from the case. And no defendant would have a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted. In short, Arizona wants to end run all we have held the Confrontation Clause to require. It cannot.

144 S.Ct. 1785, 1801.  The Court has also recognized that "the absence of proper confrontation threatens the ultimate integrity of the fact-finding process." *United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994) (internal citation omitted). Thus, to preserve the "integrity of the fact-finding process," and to respect the Supreme Court's holding in *Smith*, the Court should exercise its discretion to vacate Mr. Brown's convictions.

**II.  The district court plainly erred by applying a career offender enhancement to Mr. Brown's pre-November 1, 2023 Hobbs Act robbery and firearm offenses, in violation of the *Ex Post Facto* Clause, and U.S.S.G. § 1B1.11(b)(1).**

In calculating the applicable advisory sentencing guidelines, the district court adopted the PSR in its entirety, thereby applying a career offender enhancement to Mr. Brown's March 18, 2023 Hobbs Act robbery offense conduct. (Statement of Reasons; PSR ¶ 92). Due to the career offender enhancement, Mr. Brown's sentencing guideline range was 294 to 348 months imprisonment. *Id*. The district court imposed the statutory maximum sentence of 240 months imprisonment for the Hobbs Act robbery in count 1, to be followed by the statutory minimum

29

mandatory of 84 months imprisonment for count 2, resulting in a total sentence of 324 months imprisonment. (DE60).

The district court's 324-month sentence of imprisonment falls within the career offender guideline range. However, Mr. Brown is not a career offender. His Hobbs Act robbery offense occurred on March 18, 2023. (DE7; DE60). At that time, binding circuit precedent held that the applicable guidelines' definition of a "crime of violence," *excluded* Hobbs Act robbery. *United States v. Eason*, 953 F.3d 1184, 1195 (11th Cir. 2020). The same "crime of violence" definition which, pursuant to *Eason*, does not include a Hobbs Act robbery, determines whether a § 924(c) conviction, predicated on a "crime of violence," is subject to the career offender enhancement. *See* U.S.S.G. § 4B1.1(a)(2) (limiting enhancement to defendants whose "instant offense of conviction is a felony that is a crime of violence"); § 4B1.1(c) (determining the applicable guidelines "[i]f the defendant if convicted of 18 U.S.C. § 924(c) . . . *and* the defendant is determined to be a career offender[.]") (emphasis added).

30

While the guidelines were amended on November 1, 2023, to incorporate Hobbs Act robbery into the guidelines' "crime of violence" definition, Mr. Brown's offense took place *before* the guidelines were amended. *See* U.S.S.G. Amendment 822; DE7; DE60. Therefore, applying the November 1, 2023 guidelines to Mr. Brown's March 18, 2023 offense violates the constitutional prohibition against *ex post facto* punishment. *See United States v. Maurya*, 25 F.4th 829, 836-837 (11th Cir. 2022) (finding plain error where district court applied a post-offense version of the guidelines in violation of the *ex post facto* clause). The guidelines also explicitly provide an exception to the general rule that the guidelines at the time of sentencing apply, when such an application would—as here—violate the constitutional prohibition against *ex post facto* punishment. *See* U.S.S.G. § 1B1.11(b)(1).

Based on § 1B1.11(b)(1), as well as binding precedent, *see Maurya*, 25 F.4th at 836-837, the district court's error in applying the career offender enhancement to Mr. Brown's Hobbs Act robbery offense, and his accompanying 18 U.S.C. § 924 offense, is plain.

31

This plain error is substantially prejudicial because it increased Mr. Brown's advisory sentencing guideline range by about **15 years.** Moreover, because no party raised this issue, the constitutional dimension of this error was not contemplated by the sentencing court. There is thus a reasonable probability that Mr. Brown's sentence would have been lower, had this significant *ex post facto* violation not occurred below. *See Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016) (holding that application of incorrect, higher guideline range generally establishes plain error effecting defendant's substantial rights).

Finally, any error that poses the risk of an unnecessary deprivation of liberty undermines the fairness, integrity and public reputation of judicial proceedings. *See Rosales-Mireles v. United States*, 585 U.S. 129, 138-140 (2018). This is particularly true where—as here— the error originated with the court. *See id*. at 141. The risk that Mr. Brown will serve an additional 15 years in prison for an unconstitutional, easily-corrected sentencing error is more than sufficient to meet the fourth and final prong of plain error.

Thus, Mr. Brown's sentence should be vacated so that he can be resentenced pursuant to the correct, lower, constitutional sentencing guideline range.

## CONCLUSION

Based upon the foregoing argument and citations of authority, the

Court should vacate Mr. Brown's convictions and sentence.

Respectfully submitted,

HECTOR A. DOPICO
INTERIM FEDERAL PUBLIC DEFENDER

*s/Sara W. Kane*
Sara W. Kane
Florida Bar No. 98616
Assistant Federal Public Defender
One E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone No. (954) 356-7436
Sara_Kane@fd.org

34

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of FED. R. APP. P. 32(a)(7)(B), because it contains 6,119 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook.

_s/Sara W. Kane__
Sara W. Kane
Attorney for Appellant Brown
Dated: August 8, 2024

35

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 8th day of August, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Chief, Appellate Division, United States Attorney's Office, 99 N.E. 4th Street, Miami, Florida 33132 and mailed via U.S. Mail to Mr. Rodney Leroy Brown, Reg. No. 63969-510, USP Lee, P.O. Box 305, Jonesville, Virginia 24263.


 *s/Sara W. Kane*